MARÍA DEL CARMEN MORALES, Plaintiff and Appellant, *v.* ESPERANZA CRUZ-VÉLEZ, Defendant and Appellee.

No. 3548. Argued June 9, 1925.—Decided January 14, 1926.

1. CONCUBINAGE—COMMUNITY PROPERTY—PARTNERSHIP—ACCOUNTING—PLEADING. —A complaint in an action to recover a moiety of the property acquired by the plaintiff and her consort in concubinage is insufficient when the alleged right of the plaintiff thereto is made dependent upon the illicit relations between them, and an averment in the complaint that she contributed to the acquisition of the property with her labor, her economy, her cooperation and her means is of no importance.

2. ID.—ID.—ID.—ID.—When in an action to recover a moiety of the property acquired during concubinage it is proved that this status was pre-existent to the development and increase of the businesses and properties and that the cooperation and labor of the plaintiff woman was merely incidental to her duties as concubine, she has no right to half of the property.

District Court of Mayagüez, Angel Acosta, J. Judgment for the defendant in an action to recover community property. *Affirmed.*

*Alfredo Arnaldo, J. H. Brown* and *C. Ruiz Nazario* for the appellant. *José Sabater* for the appellee.

MR. JUSTICE FRANCO SOTO delivered the opinion of the court,

In this appeal the parties discuss certain rights alleged to have originated within an illicit relation known as concubinage.

Carmen Morales brought the action, praying to be adjudged the owner of a moiety of the undivided property described in the complaint; that she be given possession of said property, and that the rents and profits be paid over to her.

The plaintiff alleged originally that in 1879 she and Avelino Cruz Toro agreed to pool all of their properties and labor in order to share between themselves equally the profits that might be obtained therefrom. She set out the object for which the partnership was formed, the duties of each of the partners and the property contributed by them, and added a description of the properties acquired for the partnership, albeit the said properties appear in the name of Avelino Cruz. On November 15, 1921, Avelino Cruz died intestate, leaving an acknowledged natural daughter named Esperanza Cruz y Vélez, who was adjudged to be his intestate heir by a decree of November 18, 1921, and she is the defendant in this case.

After practically all of the evidence was heard, for the only thing lacking was to attach to the record, at the instance of the plaintiff, a certificate of the registry of property, the plaintiff amended her complaint in order to make it agree with the evidence, without any objection from the adverse party, and the amendments which we consider ma-

terial, in that they vary the theory of the original complaint, are as follows:

"1. Avelino Cruz y Toro and the plaintiff lived together in the same house and home from the year 1880 to the 15th of November, 1921, when Avelino Cruz y Toro died.

"2. With the means, the work, the cooperation and the economy of both during a period of over forty years Avelino Cruz y Toro and the plaintiff accumulated a capital composed of property, rights, interests and money as set forth in the sixth paragraph of the complaint hereby amended, the description of which is to be deemed as reproduced now in this count.

"3. The property and rights referred to in the preceding paragraph are in the name of Avelino Cruz y Toro; but the plaintiff alleges that she is the owner of half of the said property, because it was acquired while she was living with Avelino Cruz y Toro, she having contributed to its acquisition with her work, her economy, her cooperation and her means."

The errors assigned by the appellant because of the lower court's having dismissed the complaint are enumerated in the following order:

"1. The trial court erred in holding that the complaint did not set up facts sufficient to constitute a cause of action.

"2. The trial court erred in holding that the services (work) of the plaintiff which produced profits were incidental to the concubinary relations.

"3. The court erred in holding that there was no evidence tending to show that the plaintiff contributed in any manner to the acquisition of the properties of the deceased.

"4. The court erred in holding that by reason of and because Avelino Cruz and the plaintiff lived together, no legal contract of partnership or of community of property could exist between them.

"5. The court erred in holding that no partnership contract was proved to exist between the plaintiff and Avelino Cruz.

"6. Even supposing that there was no evidence sufficient to establish a partnership, the trial court erred in not holding that the plaintiff was entitled to the return of the value of the property contributed by her and appropriated and used by Avelino Cruz together with the profits therefrom.

"7. The lower court erred in not allowing the witnesses for the

plaintiff to testify about transactions between the plaintiff and Avelino Cruz and as to statements made by him.

"8. The judgment appealed from is against the weight and the preponderance of the evidence."

[1] In reality the evidence did not support the formation of a universal partnership between the plaintiff and Avelino Cruz. Hence the new theory of the amended complaint of making the cause of action dependent upon the illicit relations of concubinage, and the specific allegation that the plaintiff is the owner of half of each and all of the properties described because "they were acquired while she was living with Avelino Cruz y Toro, she having contributed to their acquisition with her work, her economy, her cooperation and her means."

Then it may be asked whether the said allegation is sufficient to constitute a cause of action, this being the first assignment of error that the appellant argues.

Although there is no precedent in the decisions of this court which directly dispose of the questions involved in this case, the true doctrine was laid down briefly in the case of Correa v. Quiñones, 29 P.R.R. 47, wherein for the first time it was said:

"Concubinage can not of itself create any right of any kind as regards the persons living in such a condition, and of course concubinage can not originate a legal conjugal partnership; . . ."

This doctrine so enunciated is the clear exposition of positive provisions of the Civil Code under the caption "Contracts Relating to Property by Reason of Marriage" in Title III, Chapter IV, Book Four, of the said code, by which no other civil effects are recognized than those derived from marriage, unless special marital contracts are entered into. Sections 1282 and 1310–11. The law makes no declaration in respect to concubinage, but by exclusion, *expressio unius est exclusio alterius,* the recognition of such a union was eliminated from our laws as well as the idea

that of itself it might have the same effect as a legally contracted marriage. The legislators often find it impossible to eradicate absolutely from the bosom of society certain illicit customs, because they are subjects rather for education than for legislation, but not according them civil effects is an indirect means of not fostering their development and of thwarting their existence in civil life. Here perhaps we should pause in considering this matter in order to say that as the complaint is based solely on concubinage and tainted with the seal of immorality that it carries with it, it is not sufficient to support what is therein prayed for. But it is alleged by the appellant also that this is a case in equity and an attempt is made to take advantage of certain principles upon which the decisions of other States are based in connection with circumstances that occasionally hinge on concubinage. Apart from the fact that as our system contains a clear and positive statutory rule the application of the principles of equity is a secondary matter, the general trend of the authorities is against the recognition of legal effect to all contracts whose motive, cause and consideration are based on illicit concubinary relations.

The case of *Mitchell* v. *Fish,* (97 Ark. 444, 134 S. W. 940), 36 L.R.A. (N. S.) 838, of the Supreme Court of Arkansas, cited by both parties in their briefs, upholds the general doctrine laid down. The appellant undoubtedly relies on this case because as the inferior court held therein that the contract of partnership was contaminated with immorality and dismissed the complaint, the Supreme Court reversed the judgment and ordered the division of the proceeds of the sale of the property acquired during the concubinage. However, the peculiar circumstances of the case seem to make it an exception and the general rule to which we have referred is essentially maintained. Judge Hart, who delivered the opinion of the court, said, among other things:

"The finding of the chancellor that there was a partnership was

not contrary to the weight of the evidence, and, according to the settled rules in this state, his finding in that regard will be sustained. We are of the opinion, however, that he was wrong in dismissing plaintiff's complaint for want of equity. Her suit was not brought to enforce the contract of partnership or any of its stipulations. The partnership was ended when the property was sold . . . . The question of whether the contract of partnership at the time it was formed was void as against public policy is not the controlling question in the case, but the question is whether or not one partner, having received the profits of the partnership and having voluntarily agreed with his copartner to a division thereof, is liable to such other for his share of the profits.

    ✻      ✻      ✻      ✻      ✻      ✻      ✻

"In discussing the principles of law applicable to a state of facts similar to those presented in the record, the court in the case of Morgan v. Morgan, 1 Tex. Civ. App. at page 319, 21 S. W. page 156, said: 'Applying these principles to the case at bar, if it be conceded that the relations of John E. Morgan and the appellant were illegal, and that their contract to live together and divide the property they might accumulate would not sustain an action in behalf of either (of them), if brought thereon, still we believe it can not be said that after the contract has been voluntarily executed by both, and the property has been acquired, the courts will refuse to recognize their respective interests thereon.'

". . . It is not necessary to decide whether the relation of concubinage between the parties to this suit was incidental, and was not the motive and the cause of them living together as husband and wife and forming the partnership; for we hold that, although the partnership may have been illegally formed, on account of the consideration for it being the living together of the parties illegally as husband and wife, yet when the contract has been executed without the aid of the courts, by the voluntary acts of the parties, and a division of the profits has been agreed upon, such division of profits forms a new contract, which is collateral to, and not contaminated by, the original contract, and that the partner entitled to a share of such profits may enforce his right thereto in the courts."

The notes on the same page of the *Mitchell Case, supra,* under the caption "Right to invoke aid of court to determine right to property accumulated in common by parties living in illicit relations," do not change in any way the

substantial principle. The fourth paragraph of the note says:

"The cases support the rule that an agreement to carry on business or accumulate property is valid and enforceable, although the parties were maintaining illicit sexual relations with each other during the period covered by the contract, unless the contract was made in contemplation of such illicit relationship, as where it formed a part of the consideration."

This paragraph is followed by citation of 'the cases of *Viens* v. *Brickle,* 8 Mart. (La.) 11, and *Delamour* v. *Roger,* 7 La. Ann. 153. These cases, as well as the cases of *Emmerson* v. *Botkin,* (26 Okl. 218, 109 Pac. 531), 29 L.R.A. (N. S.) 787, and *Pereuilhet, On Opposition of Doria Hautho,* 23 La. Ann. 294, uphold generally the same conclusion. It seems, however, that the fact that the claim in those cases was granted has led the appellant to quote them in support of her contention. It makes no difference. An examination of them will show that concubinage does not appear to be the cause of action.

In the *Emmerson Case, supra,* the plaintiff had had illicit relations with the decedent and she decided to present a claim for money for services rendered as housekeeper, offering evidence to the effect that there was an express agreement to pay for such services, without regard to the concubinage, and the court expressed itself as follows:

"An express contract for services to be rendered by a woman for a man as housekeeper and servant is valid and enforceable, although the parties entering into it live together in a state of concubinage during the time the services are being rendered, unless the contract was made in contemplation of such illicit relationship; and in a case where the claim for compensation is based on and grows out of the lawful services actually rendered and no part of the same has reference to the meretricious relationship existing between the parties, the same is enforceable."

And in the *Pereuilhet Case* a part of the syllabus says:

"The fact, if it were shown, that the nurse or housekeeper lived

with the man she was nursing and taking care of as concubine, does not impair or lessen her claim for wages, unless it be alleged and shown that concubinage was the motive and cause of their living together in the first instance, and the services rendered were merely incidental to that mode of living."

In the case of *Stringer* v. *Mathis,* 41 La. Ann. 987, a claim like the*former ones is denied, the Supreme Court of Louisiana saying:

"The evidence in this case satisfying us that the services for which payment is claimed, had no other motive than the pre-existing concubinage of the parties and were merely incidental to such relation, the plaintiff can not claim remuneration therefor,"

or when the claim for services as housekeeper is linked and united with a remuneration as concubine, which is not distinguishable. *Simpson* v. *Normand,* 51 La. Ann. 1355, 36 So. 266.

This case is based on the authority of the *Stringer Case* and in the latter, in commenting on the *Viens Case,* the court said:

"In Viens vs. Brickle, 8 Martin 11, the court overruled a defense of concubinage, but the opinion said, after admitting the fact of concubinage:

" 'This, however, does not seem to have been the motive of their coming together, but rather the consequence of the familiarity which a close union of interest is apt to create between persons of different sexes. We, therefore, can not view this circumstance as preventing or destroying any right which she may have on defendant for a remuneration, etc.'

"Clearly implying that had the concubinage been pre-existing and been the motive of their coming together, the defense would have been good."

The case of *Lawson* v. *Lawson,* 30 Tex. Civ. App. 47, 69 S. W. 246, and others of a similar nature cited in the note to the case of *Mitchell* v. *Fish, supra,* enter into a different field from those already analyzed. Those cases are concerned with common law marriages in which, there being good faith in the sexual relations by one of the parties, the

rights of that party are protected in those states where the common law does not prevail.

In the case of *Malady* v. *Malady,* 25 La. Ann. 448, which remains to be examined of the cases cited by the appellant, the party who sued was the lawful wife, and we do not see any relation that it can have to this action.

If we should assume that the present case is one to which the principles of equity developed in the cases examined could be applied, yet there does not appear from the terms of the amended complaint any allegation that refers to the existence of any agreement or universal partnership of ganancial property entered into between the plaintiff and the deceased independently of their living together or the sexual relations which they maintained during the period of years mentioned. The right of the plaintiff in the property, if any, is made to depend upon their illicit relations, for it is essentially alleged that the plaintiff is the owner of half of the said property "because it was acquired while she was living with Avelino Cruz y Toro." No importance can be given to the additional words, "she having contributed to its acquisition with her work, her economy, her cooperation and her means," inasmuch as the mere fact that the property was acquired by the mutual work and expenditures of the parties while living together will not create a partnership or community of interests in the property in the absence of an agreement that the parties would share in the ownership of the property. *Harris* v. *Hobbs,* 22 Tex. Civ. App. 367, 54 S. W. 1085.

Therefore, we have reached the conclusion that the complaint is not sufficient to state a cause of action.

The seventh assignment of error is not argued in the brief. The questions which the witnesses were not allowed to answer are not set out, nor the names of the witnesses. There is no basis for considering this assignment.

The remaining assignments, except the sixth which we shall take up hereafter, refer to the merits of the evidence.

The plaintiff called numerous witnesses of advanced age, many of whom were laborers and farmers and had come in contact with the parties during many years; yet, this evidence as a whole does not support the complaint in regard to the allegation that the property accumulated during the illicit relations was acquired by the work, the economy and the means of the plaintiff. Some of the witnesses, on the contrary, rather uphold the contentions of the defendant. For example, Luis Ramírez, 74 years of age, farmer, testified, among other things, that he knew Avelino Cruz y Toro when he had a store in partnership with Nestor and Pancho Quiñones and from that he derived a part of his property, not living then with Carmen Morales; that when Carmen Morales lived with Avelino Cruz she devoted herself to domestic affairs as other women do in their homes; that he did not know that Carmen Morales had a store or a partnership with Avelino Cruz. "The only thing he knew was that they lived together in their home."

Felipe Ramírez, 82 years of age, bookkeeper, corroborated the testimony of Ramírez by testifying that he knew Avelino Cruz and Carmen Morales when they were living together; that she did the regular work of a housekeeper; that he did not know that between them there was a contract to pool their property and all of their work in order to divide the profits, and that the only thing he knew was that they lived together in concubinage.

These declarations reflect the true situation of this action and are corroborated on the most important points by other witnesses for the plaintiff. Mary Quiñones could not say that Avelino Cruz and Carmen Morales mutually agreed to pool all of their property and work on equal shares of the profits. Pedro Ramírez, 66 years of age, was a farmhand of Avelino Cruz before the latter lived with Carmen Morales and testified that she already had a country store before living with him. Carmen Quiñones said that Avelino

Cruz had lands before he began to live with Carmen Morales. Juan B. Cupriles did not know that there was a partnership between them and only knew that Avelino Cruz and Carmen Morales lived in concubinage. Manuel Cruz Ramírez, 65 years of age, said that Avelino Cruz had a store before he began to live with Carmen Morales. José Flores, 35 years of age, carpenter, testified that he saw Carmen Morales engaged in the affairs of her home and did not know that she had any outside business.

There were statements made also by some of these witnesses of the plaintiff and others tending to show that she was the factotum of the home affairs as well as of the exterior business in the irregular home that they had formed. To this end it is insisted that Avelino Cruz was illiterate and could do nothing without the assistance of his concubine. But within an illicit condition, living together, united as though they were husband and wife, it was not strange that she should assume, without adding anything to her pretended right, the role that is generally played by a lawful wife and take care of her consort by intervening occasionally in his businesses, counting money in certain transactions, reading letters, papers and other documents written in connection therewith, and so gave her assistance or help in other details. These were incidental to the common life that they maintained permanently. Those and similar circumstances were present in the case of *Harris* v. *Hobbs et al., supra,* and were considered as incidental to the illicit relations maintained. Louvenia Harris, like Carmen Morales, brought suit against the heirs of Hobbs to recover half of the real and personal property belonging to Hobbs. She alleged in the most sufficient manner that she was the owner of an undivided half of the property because it had been acquired by the union and the work and expenses of the partnership formed by her and Hobbs. She claimed, moreover, certain personal property alleged to belong to her exclusively. In the instant case it is deduced from the

evidence that Carmen Morales had separate property both personal and real and that she transacted business independent of that of her consort. During the period in which Hobbs acquired all of his property Louvenia Harris lived with him, served him as cook, housekeeper and concubine and sometimes worked in the fields. She had two children when she went to live with Hobbs and he treated them as his. Later she had three children by him. Carmen Morales already had a son by another man when she went with Avelino Cruz. Louvenia testified that neither she nor her children worked for salaries or for any portion of the crops. The court finally said:

"The true analysis of the evidence is that Louvenia Harris was the concubine of Hobbs during the period in which the property was acquired, and the other offices and labor performed by her were incidental to this illicit relation. It need hardly be said that this relation did not create a partnership or community interest in the property acquired."

The evidence of the defendant, on the other hand, tended to establish clearly that Cruz possessed some personal and real property before beginning his illegal union with the plaintiff; that this status was pre-existent to the development and increase of the business and property of Cruz, and that the cooperation and work of the plaintiff to which the complaint refers was merely incidental to her duties as concubine.

[2] By the sixth and last assignment of error is raised the proposition that since the lower court held that the parties had their separate properties, contracting with them independently, it should have been consistent, but committed error in not ordering the return of the rents of the properties recorded in the name of the plaintiff and of the money withdrawn from her bank account by Avelino Cruz and his attorney in fact.

It seems a sufficient answer that the issue was not joined in that form and in order to be congruent the lower court

would have to limit itself to granting or denying, according to the circumstances of the case, what was specifically prayed for in the complaint and did not commit error in not considering a point which was neither alleged nor prayed for.

The judgment appealed from should be affirmed.